**PAYNE, Director General, v. WEISIGER.**
**. (No. 1233.)**

(Court of Civil Appeals of Texas. El Paso.
May 26, 1921. Rehearing Denied June 23,
1921.)

1. **Trial ⬤⟷351(5)—Special interrogatory held
properly refused, where covered by another
interrogatory submitted.**

In a railroad employé's action for injuries
from an explosion while attempting to start
a gasoline engine, by pouring gasoline into an
extinguished generator which was still hot, it
was not error to refuse to submit the question
as to whether plaintiff was familiar with gaso-
line, and knew that it was liable to explode
in coming in contact with hot metals; such
question having been sufficiently submitted in
one as to whether he was ignorant of the dan-
ger attendant on a relighting of the generator
in its then condition.

2. **Master and servant ⬤⟷286(41)—Negligence
in failing to warn employé, injured by explo-
sion of gasoline, held for jury.**

In an action by a roundhouse hostler, in-
jured by an explosion while he was attempting
to start a gasoline engine by pouring gasoline
on a hot generator, evidence on the question of
his ignorance of the danger and defendant's fail-
ure to warn, *held* sufficient to go to the jury.

3. **Master and servant ⬤⟷155(2) — Danger of
attempting to start gasoline motor held not
so open as to relieve master of duty to warn.**

In a railroad employé's action for personal
injuries sustained by the explosion of gasoline
while he was attempting to start a motor by
pouring gasoline on a hot generator, the danger
*held* not so open and apparent as to relieve the
master of the duty to warn.

Appeal from District Court, El Paso Coun-
ty; Ballard Coldwell, Judge.

Action by E. S. Weisiger against John
Barton Payne, Director General. Judgment
for plaintiff, and defendant appeals. Af-
firmed.

W. A. Hawkins, W. M. Peticolas, and Del
W. Harrington, all of El Paso, for appellant.
Hudspeth, Wallace & Harper, of El Paso,
for appellee.

HARPER, C. J. This suit was instituted
by E. S. Weisiger against the Director Gen-
eral of Railroads for damages for personal
injuries alleged to have been caused by being
burned by an explosion of gasoline on the
night of November 29, 1919. Several grounds
of negligence were pleaded and all of them
submitted to the jury upon special issues,
and all found against appellee except the fol-
lowing:

Appellee was directed to start a gasoline
engine for the purpose of pumping water;
that he heated up the generator, and when
attempting to turn on the air found the pipe
disconnected; that after he had repaired the
pipe he attempted again to light the genera-
tor with gasoline from a can; that it explod-
ed, and seriously and permanently injured
him; that he was inexperienced in the work,
unfamiliar with the danger; and that appel-
lant knew of the danger; and knew that ap-
pellee was ignorant of it, and failed to warn
him.

Defendant answered by general denial;
that plaintiff was 45 years old, had had ex-
perience, and was fully aware of the danger
incident to pouring gasoline upon the genera-
tor after it had been once lighted and had
thereby become heated; that the appliance
was simple; that he therefore assumed the
risk; that he had been fully instructed and
warned with reference to the manner of
starting and operating the machine; that he
had operated a similar engine for many
months prior to the accident, and knew and
appreciated the danger arising from pouring
gasoline upon a heated generator, and there-
fore assumed the risk.

The court submitted the following ques-
tions pertinent to the ground of negligence
above noted:

Question No. 2½: "Do you find from a pre-
ponderance of the evidence that at the time of
the happening of the accident the plaintiff was
inexperienced and ignorant of the danger, if
any, of relighting the generator in its then con-
dition, and that this inexperience and ignorance,
if any, was known to the defendant at the time
he was directed to run the pump in question?"
This question the jury answered, "Yes."

Question No. 3: "Do you find from a pre-
ponderance of the evidence that defendant and
his employés failed to notify or warn plaintiff
of the danger of lighting the generator, as he
attempted to do, and that if they did fail it
was negligence on their part, under the cir-
cumstances, to fail to so warn and notify plain-
tiff, and that such negligence, if any, was a
proximate cause of plaintiff's injuries?"
This question the jury answered, "Yes."

Question No. 4: This question simply asked
how much the damages were, and the jury an-
swered, $10,000.00."

At the defendant's request, the court sub-
mitted defendant's question No. 1 as follows:

"Did the plaintiff, Weisiger, know at the time
he poured gasoline, which exploded, on the gen-
erator, that it was dangerous to throw gasoline
thereon, at the time and under the circumstanc-
es when he did throw it on?"
This question the jury answered, "No."

Also, at defendant's request, the court
submitted question No. 2, as follows:

"Would an ordinarily prudent person, under
the circumstances present and at the time when
Weisiger threw the gasoline that exploded on
the generator, have known and appreciated the
danger in so doing?"
This question the jury answered, "No."

⬤⟷For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Both of the above questions were asked by the defendant only in the event that his peremptory instructions were refused. Judgment was entered for plaintiff for $10,000, from which an appeal is perfected.

Taking up the assignments in the order which we deem most convenient:

[1] The fourth assignment charges error in refusing to give the following special charge requested by appellants:

"Was the plaintiff at the time of the accident familiar with gasoline, and did he know that in coming in contact with hot metals, sparks, or flame it was likely to explode and was dangerous?"

This question would have, if submitted, called for a finding as to the general knowledge of appellee concerning the likelihood of an explosion from gasoline when coming in contact with heat and fire in a general way, and of course this is a matter of common knowledge; but the general charge, Nos. 2½ and 3, submit the specific issue pleaded, to wit, Was he ignorant of the danger attendant upon a relighting of the generator in its then condition? and we think sufficiently and properly submitted the issue.

[2] By the eighth and ninth it is urged that the court erred in refusing to submit two special charges to the effect that:

"The defendant owed the plaintiff no duty to instruct him as to the danger of gasoline exploding upon coming in contact with hot metal sparks or flame, because, defendant's appliances being safe and in good condition, the danger arose, not from anything done or left undone by the defendant, but from plaintiff's own act, and defendant could not reasonably anticipate that plaintiff would pour gasoline on an appliance where gasoline had been poured and lit shortly before."

The other specifications of error are substantially to the same effect, "That the court should have instructed a verdict for the defendant," and that it was error to submit the question of ignorance of appellant of the danger and failure to warn, etc., because the facts in evidence are insufficient to support a verdict for plaintiff.

The plaintiff testified that he was 45 years old; that at the time of the accident and for 2 years prior thereto he had worked for the Director General of the Southwestern Railroad as hostler, and in the water service as repairman; by hostling he meant handling engines, moving them in and out of the roundhouse, and from one place to another; that during all the time he was working as hostler he had not come in contact with the operation of gasoline or oil burning engines, that he knew nothing about that, and further testifying he said:

"I don't know whether my foreman, at the time I met with my accident, knew of my previous experience with the Southwestern or not. He could have known; the records were open.

At the time I met with my accident, November 28, 1919, I was directed by my foreman to pump that night. My foreman, Mr. Eubanks, told me to do the work. I was off in a house about 100 yards from where I got hurt, cleaning up the house. He came to me and told me that I had to relieve the day man that day at 7 o'clock. I better go home and get my supper, and get back to relieve the day man. At that time he did not give me any instructions or warning as to how to operate that machine. He certainly did know at that time that I had never had any experience in running a gasoline engine. When I came back to work, I relieved Mr. Hamilton, the regular pumper, the day pumper. He had been on that job for, I suppose, 14 or 15 years, and during that time I had known him intimately. He knew the kind and character of work I had been doing, and he knew, when I went down there, that I knew nothing about the engine. No, sir; he didn't give me any instructions or warning as to how to start the engine. The engine was not running at that time. I had attempted to start the engine about two or three times before the time I got hurt. I had started it by heating the generator. I got my information as to how to heat the generator by just happening to see some one heating it that way. I was not familiar with the mechanism of the generator at that time. When I took the job that night from this foreman, he did not say anything to me about the generator, whether it was clean or dirty. I did not know at that time that a generator of that character I was working with that night, to start this particular engine where I got hurt, would accumulate carbon or soot, and be required to be cleaned out, and I did not know that the carbon and soot, if allowed to accumulate, would hold fire. When I went down there that night, the engine was standing, and I had to heat it up with the generator. This generator was up probably to the top of my head, it was about even with the top of my head, and it got heated up. I heated it up with gasoline. I got a tomato can about three-fourths full, and poured a little on it and heated it up, and got it ready to start my engine, and got down to turn the air on to blow it. As I turned the valve on, I discovered I was losing air about 15 feet from the engine. I, shut the valve off, and got a wrench, and took out a nipple, and got a 1¼-inch plug, and plugged the air line up. I should judge I had been 15 minutes—15 or 20 minutes—doing that work. The generator had cooled off, and I put more gasoline on. I got my gasoline in the tomato can, about three-fourths full of gas, and got it and couldn't see any blaze or anything, and poured a little gas on the generator; as I done that it ignited, and the blaze run in the can and exploded and set me on fire. You have to have the air to blow the engine. I don't know who disconnected that pipe, and I did not know it was disconnected when I went to work. The man I relieved did not tell me it was disconnected. They had been working around the engine that day; the foreman and five or six men worked on this other engine until 10 o'clock that night. The explosion occurred at 11 o'clock. When they went off work, they did not tell me they had disconnected some part of the machinery and appliances. This air pipe sets off 15 feet, in behind another engine. As

to when I discovered the pipe was disconnected, when I turned the air valve onto the air drum, I heard it hissing. Then I shut it off and went and plugged it up. I saw the foreman who was in charge of that work before or at about the time he left the works, and he didn't say anything to me about that being disconnected. The first time I discovered it was when I went to turn the air onto the drum. The purpose of that is to blow the generator and heat the hot head. I should judge it was 15 or 20 minutes from the time I discovered that the air was disconnected up until the time I met with my accident; not any longer. At the time I discovered that the pipe was disconnected, I should judge it had been about 15 minutes since I had poured the gasoline in the generator and set it afire. When I started away to fix this pipe, the gasoline in this generator seemed to be burning a little, but not much. The generator was about even with the top of my head. It was a very cold night, freezing, and it was cold where the generator was. It got in through a double door. It was 15 or 20 minutes from the time I left it to fix the pipe until I got back and started to pour the gasoline in the generator the second time. When I came back to relight the generator, I just glanced at it, and couldn't see any fire. Then I poured the gas on it—started to pour it on—and, as I stated, the explosion occurred. At that time I had not received any warning or instruction from my superior as to how to handle this generator in the event it became necessary to relight it. I never was instructed, nothing was said. I did not know about the danger of relighting the generator. I had not received instruction or warning as to how to use the generator, and the time necessary to intervene from the time it was first lighted until the time I might want to light it the second time. As to how I looked to see whether or not there was any fire in the generator at the time I poured the gasoline on, well, I got up as far as I could. This generator was setting about the top of my head, and there was no way to get up to see over the generator to see the condition, how the condition was. I got as high as I could to look into the generator. It was dark in there, so, as far as I knew at that time, there was no blaze of fire in that generator. As to the claim that, prior to that time, I had worked on an engine of a similar character at Columbus, N. M., the Columbus engine is altogether a different engine from the Hachita plant. The Columbus engine is a Stover engine, and the Hachita is a Crescent. There was a difference in the manner of starting the two engines. The Stover is lit with a blow torch; the one at Columbus, you pick it up and pack it around. The Columbus engine is lit different from the Hachita; it is lit with a blow torch, and the Hachita is lit with a generator. You do not take gasoline the same way with the two; starting the two, it is two different ways. The blow torch is a little round ball filled with gas, and you pump air in, and it blows the hot ball; that is different from the Hachita engine. I worked at the Columbus plant two months. Before I went to work there, I had instructions as to how to handle that engine; they put a man with me and he stayed one day. He gave me full instructions as to how to start it. I had never attempted to relight this particular engine at Hachita before the time I got

hurt; that is the first time I ever relit that engine. I should think the tomato can was about half full of gasoline at the time it exploded. The tomato can would probably hold a quart. I don't know why I used a tomato can, instead of some other appliance to pour this in there; that is all that there was. This fire run down in the can; that exploded and threw the gas on my clothes."

On cross-examination he testified:

"I worked 10 or 11 years as a hostler. I entered the service as water service man August 1, 1918. I got hurt on November 28, 1919. I don't remember whether in September, 1918, I worked as repairman in the pump station at Columbus. In October, 1918, on the 1st, 2d, 10th, 15th, 16th, 17th and 31st, I worked at Hachita, installing this particular pump. In February, 1919, I helped install the pumping plant and engines at Columbus. In March, 1919, I worked, installing the Columbus plant. On the 29th and 30th of that month I worked at Hachita as repairman on the engines. In April, 1919, on the 17th, 18th, 23d, and 24th, I worked repairing the engine at Columbus. May 18th and 20th I worked repairing engine at Hachita. From June 10 to 19, 1919, I guess I did run the booster engine at Hachita. In July, 1919, on the 26th and 27th, from the 28th to 31st, I worked repairing the engine at Hachita. In August and September, 1919, I was in charge by myself, as day pumper, of the oil engines at Columbus. On October 15 and 17, 1919, I worked repairing the engines at Hachita. In November, 1919, the month I got hurt, on the 2d and from the 3d to the 8th, and from the 16th to the 17th, I was running this particular engine at Hachita. The engine at Columbus was a Stover and the one at Hachita was a Crescent. This particular engine was called the 'booster' engine, and there is one other main engine in that building. To light the generator you pour gasoline on it and light your gasoline. When it gets hot, you turn on air from the compression tank. That gives a blue flame, shooting out like a blow torch. This blue flame heats a round piece of iron, called a 'hot head' or 'hot ball.' After you have lit your generator, turned on your air, got your blue flame, and your hot ball hot enough, you then rock your flywheel to start the engine. Then you turn off the blow torch. The heat, I suppose, from the hot ball, keeps the engine running. You get the hot ball red hot. The engine introduces the oil into the cylinder; it strikes the hot metal, and explodes, and shoots the piston. Another charge is introduced, and strikes the hot metal, and explodes again. The Crescent engine uses a generator attached to the engine, and the Stover uses a blow torch. The blow torch on the Stover and the blow torch on the Crescent heat the hot ball by compressed air blowing the flame. I went that night, and poured gasoline on the generator, and lighted it. I opened my air valve, and didn't have any pressure, and could hear it hissing out somewhere else. I went and stopped up the disconnection. I came back, glanced at the generator, to see if there was any flame in it, got my quart can half full of gasoline, threw it on there, and then the trouble commenced. At the time I poured the gasoline on the first time, the hood of the generator was open. When I

went over to plug my pipe, I left the hood open. It was still open when I came back, and I left it open when I poured the second gasoline on it, and when I went to Columbus to work Homer Clark instructed me about the running of these engines and the use of the gasoline torch, and I ran them very successfully for two months myself. I had no idea that gasoline was dangerous when thrown on a flame or hot metal. I had a house burn down once, though, through a gasoline explosion. I wasn't home at the time, but was told about it afterwards. Between August 31, 1918, to November 29, 1919, I worked as a water service repairman at times, and at other times as actual operator of one of these engines at Columbus and Hachita. In November I worked 10 or 15 days prior to this accident, running this particular engine. I never had to start the engine at Hachita, but at Columbus I had to start it myself. I have seen the engine started. I have never seen a man take a ball of waste and soak it in gasoline and start it. Most anybody would know it is a fact that the engine is run by the hot metal and the hot ball exploding the gasoline. I didn't know that gasoline, thrown on hot metal, might explode, or that, if thrown on a flame or spark, it might explode. I don't know exactly the time my house burned down, but it was four or five years ago. I wasn't there. The way my wife told me, she had a can of gasoline setting outside, and a can of coal oil, and she went out to start the fire, and got the gasoline can, and went in and poured it on the fire she had started that morning, thinking it was coal oil, and it blew up and set the house on fire."

It is conclusively established that it was extremely dangerous to pour gasoline in this generator to relight it so soon after it had gone out, in the way it was done in this instance, both by the testimony and the fact of the explosion. The court did not submit the disconnected air pipe as negligence, because it was clearly not the proximate cause, and the other acts of negligence charged have been eliminated by findings of the jury, leaving only the question of duty to warn appellee of the danger of gasoline exploding when brought in contact with hot metal, in the performance of his work in operating this particular engine. Labatt's Master and Servant says:

"The question whether the master, at the time of engaging the servant or afterwards, ought to have inquired whether he was experienced or not, or should have taken notice, under all the facts, of the probability that he was not, nothing being said on the subject by either party, is a question for the jury."

Appellee says he was employed as a hostler, and his immediate work was to handle engines, move them in and out of the roundhouse, and the evidence discloses that he did a general repair work, cleaning, etc.; that he was unfamiliar with the ways and means of operating oil and gasoline engines; that on the night in question he was taken from his regular work, and put to operating this engine to relieve the regular engineer; and that he knew how to start it by having seen some other person do so.

There is evidence, circumstantial, which tends to show that he knew of and should have appreciated the danger of restarting the generator in the way he did; but it is admitted that he was not instructed concerning the dangers, so it simply presents a question of conflicting testimony upon the issue, and we are not authorized to disturb the verdict in such cases. Texas & Pac. Ry. Co. v. Bursey, 192 S. W. 809; M., K. & T. Ry. Co. v. Walker, 26 S. W. 513; note, 28 L. R. A. (N. S.) p. 1253; also, note, 45 L. R. A. (N. S.) 658.

[3] We are not prepared to hold that the danger in this instance was so open and apparent as to relieve the master of the duty to warn. Currans v. Seattle & S. F. Ry. et al., 34 Wash. 512, 76 Pac. 87; Tex. & N. O. Ry. Co. v. Gardner, 29 Tex. Civ. App. 90, 69 S. W. 217; Yellow Pine Oil Co. v. Noble, 101 S. W. 276; note, 35 L. R. A. (N. S.) 679; Bollington v. Railway Co., 125 Ky. 186, 100 S. W. 850, 8 L. R. A. (N. S.) 1045; Allegheny Imp. Co. v. Weir, 96 Ark. 500, 132 S. W. 462; H. & T. C. Ry. Co. v. Malloy, 54 Tex. Civ. App. 490, 118 S. W. 721; I. & G. N. Ry. Co. v. Wray, 43 Tex. Civ. App. 380, 96 S. W. 74.

The judgment is therefore affirmed.